IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 23, 2002 Session

## UNION PLANTERS NATIONAL BANK v. AMERICAN HOME ASSURANCE COMPANY

**An Appeal from the Circuit Court for Shelby County**
**No. 32126-3 T.D.     Karen R. Williams, Judge**

---

**No. W2001-01124-COA-R3-CV - Filed March 18, 2002**

---

This is an insurance case dealing with a standard loss-payee clause. On September 1, 1980, the appellee insurance company issued an aircraft hull and liability insurance policy to a commercial airline. The policy had an attached breach of warranty endorsement specifying the appellant bank as the loss payee for a particular airplane. In November 1980, the airline cancelled its insurance coverage for the airplane without giving notice to the bank. In December 1980, the airplane was found in Puerto Rico and seized by the United States government as an instrument of drug trafficking. When the airplane was seized, the seats and log books were missing. The bank sought recovery for the loss to the airplane under the breach of warranty endorsement attached to the original insurance policy. The insurance company denied coverage, and the bank sued the insurance company in the trial court below. The trial court granted summary judgment in favor of the insurance company. The bank now appeals. We reverse, finding that because notice of the cancellation of the insurance policy was not given to the loss-payee bank, the cancellation was not effective as to the loss-payee.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Reversed in Part, Affirmed in Part, and Remanded**

HOLLY K. LILLARD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

John J. Mulrooney, Memphis, Tennessee, for appellant Union Planters National Bank.

Richard Glassman and R. Douglas Hanson, Memphis, Tennessee, for the appellee American Home Assurance Company.

**OPINION**

This is an insurance case dealing with a standard loss-payee clause.[1]  On February 27, 1980, Owen C. Bell ("Bell") borrowed the purchase price of an airplane from plaintiff/appellant Union Planters National Bank ("UP Bank").  Under the terms of the security agreement, Bell was required to keep the airplane insured with a policy of insurance that included a loss-payable clause for the benefit of UP Bank, a breach of warranty endorsement for the benefit of UP Bank, and a provision providing for not less than thirty (30) days written notice to UP Bank prior to the cancellation of the insurance policy.

Bell leased the airplane to Scenic Airlines, Inc. ("Scenic").  The lease agreement required Scenic to assume Bell's obligation to keep the airplane insured.  Accordingly, Scenic purchased an aircraft hull and liability insurance policy from defendant/appellee American Home Assurance Company ("American Home"), which listed Scenic as the named insured for a policy period of September 1, 1980, to September 1, 1981.  The policy included an attached breach of warranty endorsement naming UP Bank as the breach of warranty beneficiary and loss payee as to the airplane.  The parties agree that the language in the breach of warranty endorsement is a "standard" mortgage clause as is used in more conventional forms of insurance, such as fire insurance policies. The clause provides in pertinent part:

BREACH OF WARRANTY ENDORSEMENT

In consideration of an additional premium . . . it is understood and agreed that loss, if any, under any Physical Damage coverage provided by this Policy, shall be payable to [Scenic, as the named insured,] and [UP Bank] (hereinafter called the Lienholder) as interest may appear.

1.  As to the interest of the said Lienholder only, the insurance afforded by any Physical Damage Coverage of this Policy shall not be invalidated by any act or neglect of the Named Insured nor by any change in the title of ownership of the aircraft but conversion, embezzlement or secretion by or at the direction of the Named Insured is not covered hereunder; provided however that:

> (a) in case the Named Insured shall neglect to pay any premium due under this Policy the Lienholder shall, on demand, pay the premium; and

> (b) the Lienholder shall notify the Company of any change of title or ownership of the aircraft or apparent increase of hazard, which shall come to the knowledge of the Lienholder, and, unless

---

[1] Many of these facts are taken from this Court's previous opinion in this case, *Union Planters Nat'l Bank v. American Home Assurance Co.*, 865 S.W.2d 907 (Tenn. Ct. App. 1993).

permitted by this Policy, it shall be endorsed thereon and the Lienholder shall, on demand, pay the premium for such increased hazard.

*   *   *

5.  In the event this Policy or this endorsement is cancelled by the Company thirty (30) days prior notice shall be sent to the said Lienholder named herein.

Thus, the endorsement provided that UP Bank was entitled to thirty days notice prior to cancellation of the policy, and stated that the insurance would not be invalidated by any act of Scenic or change in ownership of the airplane except "conversion, embezzlement or secretion"of Scenic. The insurance policy to which the above breach of warranty endorsement is attached provides in pertinent part:

DECLARATIONS
Item 3.  THE NAMED INSURED IS [A] . . . CORPORATION . . .
        BUSINESS OF NAMED INSURED   Commuter Airline

Item 4.  THE AIRCRAFT WILL USUALLY BE [Hangared at] McCarron Airport, Las Vegas, Nevada

*   *   *

Item 7.  THE AIRCRAFT WILL BE USED ONLY FOR [Special Uses]
        (If applicable, the term "Special Uses" is defined as) Each and every use in connection with the Insured's operations.

Item 8.  PILOTS: This Policy shall not apply to any aircraft while in flight unless operated by the following named pilot(s) holding a current and valid Medical Certificate and Pilot Certificate with appropriate ratings for the flight involved as required by the F.A.A. [and] Certified and qualified and approved by the Insured.

Item 9.  LOSS, if any, under the Hull coverage shall be payable as interest may appear, to the Named Insured and [UP Bank.]

*   *   *

INSURING AGREEMENT

*   *   *

III.  Physical Damage (Hull) Coverages

-3-

Coverage F – All Risk Basis. To pay for any physical damage loss to the aircraft, including disappearance of the aircraft.

Coverage G – All Risk Basis Not in Flight. To pay for any physical damage loss to the aircraft sustained while the aircraft is not in flight and which is not the result of fire or explosion following crash or collision while the aircraft was in flight.

Coverage H – All Risk Basis Not in Motion. To pay for any physical damage loss to the aircraft sustained while the aircraft is not in motion under its own power or momentum and which is not the result of fire or explosion following crash or collision while the aircraft was in motion under its own power or momentum.

\* \* \*

DEFINITIONS

\* \* \*

"Physical Damage" means direct and accidental physical loss of or damage to the aircraft, hereinafter called loss, but does not include loss of use or any residual depreciation in value, if any, after repairs have been made.

The insurance policy, then, notes that the airplane would usually be hangared in Las Vegas, and specifies that the policy would apply only if operated by named pilots holding an appropriate certificate. The policy was to pay for "physical damage" to the airplane.

Scenic terminated its lease with Bell on November 14, 1980, and returned the airplane to Bell in Nashville, Tennessee. Bell accepted the airplane as being in satisfactory condition with the seats and the maintenance and repair log books intact. UP Bank was not notified of Scenic's termination of the lease and transfer of the airplane. On November 20, 1980, Scenic instructed American Home to delete the airplane from Scenic's American Home policy effective November 15, 1980. At that time, UP Bank was not notified of the deletion of the airplane from the breach of warranty endorsement attached to the insurance policy. In fact, American Home did not send UP Bank written notice of its cancellation of coverage of the airplane until March of 1981, well after the loss occurred.

On December 4, 1980, Bell leased the airplane to Robert B. O'Neal, Jr., and Tina-O Film Enterprises, Inc., and O'Neal took possession of the airplane. On December 9, 1980, the airplane was seized by the United States government in San Juan, Puerto Rico, while apparently being used for drug trafficking by a third party to whom O'Neal loaned the airplane. For unexplained reasons, the original seats and log books were missing when the airplane was seized.

-4-

In a letter dated March 11, 1981, UP Bank was formally notified that the airplane had been deleted from the insurance policy at the time of the loss. On March 27, 1981, UP Bank contacted Bell, and on that date first learned that the airplane had been seized by and forfeited to the United States government.

On April 3, 1981, UP Bank sent letters to Scenic's insurance agent and American Home's representative on the policy giving notice of the seizure and requesting a copy of the policy. The agent replied by letter dated April 13, 1981, denying coverage for UP Bank at the time the airplane was seized, because "this aircraft was deleted from our Insured's policy effective November 15, 1980."

On October 20, 1981, UP Bank filed a proof of loss with American Home. American Home's representative responded by denying that UP Bank had coverage under the breach of warranty endorsement at the time of the loss.[2]

On December 29, 1989, UP Bank filed this action against American Home seeking to recover under the breach of warranty endorsement for the loss to the airplane. Initially, UP Bank alleged that American Home was liable both for physical damage loss to the airplane and for the amount due on the mortgage debt. The trial court granted total summary judgment in favor of American Home, and UP Bank appealed to this court. We reversed, finding that only partial summary judgment was appropriate. *Union Planters Nat'l Bank v. American Home Assurance Co.*, 865 S.W.2d 907 (Tenn. Ct. App. 1993). We determined that the trial court was correct in dismissing the claim on the mortgage debt, but that the "[p]laintiff has stated a claim for recovery of physical damage to the aircraft." *Id.* at 911. Thus, the case was remanded for further proceedings. *Id.* at 913.

On remand, the trial court bifurcated for trial the issues of coverage and damages. On December 8, 1999, during the coverage phase, the trial court stated in a letter that American Home's "motion for partial summary judgment is not well taken and will be denied." However, on November 21, 2000, at a hearing on UP Bank's motion for clarification, the trial court apparently changed its position and granted summary judgment in favor of American Home. On December 11, 2000, the trial court orally stated its reasons for finding that no coverage existed:

> THE COURT: The [defendant's] accident argument was the one that I didn't buy. All right. Let me see if I can read my now cold notes. Bell had [a] duty to provide insurance for [the] benefit of the mortgage holder [UP Bank]. Scenic returned the plane to Bell who re-leased it to O'Neal and Tina-O. Film. Scenic then

---

[2] In paragraph 2(c), the breach of warranty endorsement provides that "no payment shall be made until after [UP Bank] has exhausted all reasonable means of collecting the amount due" on the indebtedness. As a result of a petition filed by UP Bank, the government turned the airplane over to UP Bank on August 8, 1981. UP Bank attempted to collect the amount due from Bell through the sale of the airplane and through litigation against Bell from September of 1981 through March of 1988. The parties do not dispute that UP Bank made all reasonable efforts to collect the amount due.

notified its insurance company to take this particular airplane off the policy. Seats and log books were present in the airplane on 12-5-80. . . .

There was no insurance because, one, Scenic had the plane removed from the policy coverage. No one was paying any premiums. The defendant could have asked the plaintiff to continue paying those premiums, but they did not do that. Two, the plane was not hangered [sic] in the Continental United States. We didn't even have the name of the hanger [sic]. And that was one of the requirements in the insurance policy. The airplane was being — was not being flown by approved pilots. We don't know who was flying it. And, therefore, the insurance company could not have evaluated the risks for the purposes of pricing the policy. There was no meeting of the minds. There endeth my notes.

On December 12, 2000, an order was entered incorporating the oral ruling and dismissing the action. From this order, UP Bank now appeals.

This appeal involves the interpretation of a contract, namely, of the American Home insurance policy and the attached breach of warranty. The interpretation of the policy and the breach of warranty is a matter of law, not of fact. *See Union Planters*, 865 S.W.2d at 912. Therefore, we review the trial court's conclusions of law *de novo* on the record, with no presumption of correctness. *Id.* (citing *Adams v. Dean Roofing Co.*, 715 S.W.2d 341 (Tenn. Ct. App. 1986)).

UP Bank first argues that the trial court erred in determining that coverage was properly denied based on the fact that "Scenic had the plane removed from policy coverage." UP Bank argues that Scenic's act of removing the airplane from its policy is not one of the acts specified in the loss-payable clause as an act which would invalidate coverage to UP Bank. That clause reads in pertinent part:

1. As to the interest of the said Lienholder only, the insurance afforded by any Physical Damage Coverage of this Policy shall not be invalidated by any act or neglect of the Named Insured nor by any change in the title of ownership of the aircraft but conversion, embezzlement or secretion by or at the direction of the Named Insured is not covered hereunder . . . .

UP Bank argues that, under this clause, Scenic's actions or inactions cannot invalidate the insurance coverage as to the loss-payee, UP Bank, absent Scenic's conversion, embezzlement, or secretion of the airplane.[3]

---

[3]This situation is unlike that in *General Electric Credit Corp. v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 754 (Tenn. Ct. App. 1988), which was decided on strikingly similar facts. In that case, Ray Ownby leased an airplane from the lessor and was the named insured on the aircraft insurance policy. During the coverage period, the airplane was seized by the government of Columbia, South America, because of its clandestine entry into the country. Ownby was later convicted of drug charges related to the use of the airplane. *General Electric Credit Corp.*, 765 S.W.2d at 752.
(continued...)

Generally, a "loss-payable" clause provides that proceeds of an insurance policy are to be paid first to the designated loss payee rather than to the named insured. A loss-payable clause is generally one of two types: (1) "simple" or "open" or (2) "standard" or "union." A "simple" or "open" loss-payable clause provides simply that, when a covered loss occurs, the proceeds of the policy shall first be distributed to the lender. Under that type of clause, the lender's rights are no greater than those of the insured. *See Reeves v. Granite State Ins. Co.*, 36 S.W.3d 58, 60 (Tenn. 2001); *see also* 4 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3d § 65:15 (1996) (hereinafter "COUCH ON INSURANCE"). For example, in *Hocking v. Virginia Fire & Marine Ins. Co.*, 42 S.W. 451 (Tenn. 1897), *cited in Reeves*, 36 S.W.3d at 60, the court held that the mortgagee's rights terminated when the insured intentionally burned down the covered property and thereby invalidated the mortgagee's right to the proceeds of the insurance policy. In such a situation, the loss payee's right to coverage extended no further than the insured's right to coverage. In contrast, in the second type, the "standard" or "union" type of loss-payable clause, language is added to prevent the policy from being invalidated by the insured's actions or neglect, and thus establishes a separate contract between insurance company and the loss payee. *Id.* at 60-61; *see General Electric Credit Corp. v. Kelly & Dearing Aviation*, 765 S.W. 2d 750, 754 (Tenn. Ct. App. 1988). "The essential nature and function of the standard/union clause is 'to furnish to the mortgagee a reliable security in a definite sum free from any interference on the part of the mortgagor which would, to any extent, invalidate or make less adequate that security.'" *Id.* (quoting *Laurenzi v. Atlas Ins. Co.*, 176 S.W. 1022, 1026 (Tenn. 1915)); *see also* COUCH ON INSURANCE, *supra*, § 65:32.

The parties agree that this case involves a "standard" loss-payable clause, because the clause provides that coverage as to UP Bank will not be invalidated by the acts or omissions of Scenic, except in the event of "conversion, embezzlement or secretion" by Scenic. *See Union Planters*, 865 S.W.2d at 908. UP Bank argues that Scenic's action of removing the airplane from the policy did not constitute conversion, embezzlement, or secretion of the airplane, and therefore did not invalidate coverage as to UP Bank.[4]

A similar factual situation was discussed by the Supreme Court of Alaska in *Underwriters at Lloyd's, London v. United Bank Alaska*, 636 P.2d 615 (Alaska 1981). In *Underwriters*, as in the instant case, the insured deleted one of its airplanes from coverage under its policy of hull insurance which insured various aircraft used, but not owned, by the insured. *Underwriters*, 636 P.2d at 616. The loss-payee bank was not notified of the cancellation. The loss of the subject aircraft occurred after it had been deleted from coverage. The insurance company denied coverage to the designated loss payee, the lending bank, maintaining that the airplane was not covered under the policy because

---

[3](...continued)

The court held that coverage did not exist under the lienholder's endorsement because the insured had converted the airplane through its intentional misuse thereof. *Id.* at 754. In the instant case, however, American Home makes no allegation that Scenic, the named insured, converted, embezzled, or secreted the airplane. Therefore, *General Electric Credit Corp.* is inapposite.

[4]Again, we note that American Home makes no allegation that Scenic converted, embezzled, or secreted the airplane.

it had been removed from coverage prior to the loss. The Alaska court rejected that argument, finding that the standard loss-payable clause included in the attached breach of warranty endorsement protected the bank's coverage from being invalidated by the "acts" of the insured, such as the insured's unilateral cancellation of the policy with respect to the subject airplane. *Id.*, 636 P.2d at 618. Thus, the *Underwriters* court held that, absent effective notice of the cancellation, the bank's right to recover was not impaired. *Id.*

American Home argues that *Underwriters* is distinguishable. Under the policy in the instant case, American Home maintains, American Home was not required to give UP Bank notice of the deletion of the airplane in order to effect a cancellation of coverage under the breach of warranty endorsement. American Home contends that UP Bank was entitled to notice only if American Home had cancelled the *entire insurance policy*. The applicable notice provision reads:

> 5. In the event this Policy or this endorsement is cancelled by [American Home,] thirty (30) days prior notice shall be sent to [UP Bank].

Under American Home's interpretation of this provision, because American Home did not cancel the entire policy or the entire endorsement, the notice provision did not require it to give UP Bank notice when coverage was cancelled for only one airplane covered by the policy.

"[T]he cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles." *Union Planters*, 865 S.W.2d at 912. In determining the intent of the parties, the court must consider the contract as a whole, and the words expressing the parties' intentions should be given their usual, natural, and ordinary meaning. *Id.* Furthermore, the notice provision in the breach of warranty endorsement should be strictly construed "because the cancellation right and requirement of notice of such cancellation is for the benefit of the insured to give the insured time to obtain other insurance or protection." *State Auto. Mut. Ins. Co. v. Lloyd*, 393 S.W.2d 17, 26 (Tenn. Ct. App. 1965).

The endorsement to which this notice provision applies identifies over twenty lienholder/loss payee relationships that are covered by the endorsement. Under American Home's argument, none of those lienholders would be entitled to notice of cancellation of their insurance coverage unless the entire policy or the entire endorsement were cancelled by American Home. This interpretation of the policy gives the loss payees no right to notice of a cancellation of coverage as to an individual covered item in order to give them time "to obtain other insurance or protection." *Id.* Such an interpretation is unreasonable. Moreover, each lienholder/loss payee relationship listed on the endorsement creates a separate obligation under the contract. Therefore, if one aircraft is deleted from coverage, in effect the entire endorsement *is* cancelled, even if only with respect to that lienholder. Consequently, when coverage is cancelled with respect to one aircraft, we must conclude that the notice provision requires American Home to give thirty days notice of that cancellation to the respective lienholder; if this is not done, the cancellation of coverage is not effective as to the lienholder, absent one of the specified acts by the insured, such as conversion, secretion or

embezzlement. Thus, under the circumstances of this case, Scenic's removal of the airplane from coverage did not affect UP Bank's rights as loss payee.

UP Bank next argues that the trial court erred in finding a lack of coverage because the airplane was not hangared in Las Vegas, Nevada, and the airplane was not being flown by an approved pilot, as specified in the Declarations portion of the policy, quoted above. American Home asserts that the trial court was correct in this respect, and that the loss was not covered for the additional reason that the airplane was not being used in connection with Scenic's operations at the time of the loss. UP Bank stipulates that, indeed, those conditions were not met – the airplane was not hangared in Las Vegas, Nevada, it was not being flown by an approved pilot, and it was not engaged in conducting the business of Scenic. UP argues, however, that under the standard loss-payable clause, its right to recover under the endorsement is unaffected by the insured's breach of such policy conditions that occurred without knowledge of the loss payee.

In support of its position, UP Bank cites *Phoenix Mutual Life Insurance Co. v. Greene County Farmers' Fire Insurance Co.*, 54 S.W.2d 971 (Tenn. 1932). In *Phoenix*, a policy with an attached standard mortgage clause provided fire insurance on the subject property. The policy excluded coverage for losses occurring when the property was unoccupied. The property was destroyed by fire at a time when the property was unoccupied, and the insurance company denied the mortgagee's claim for coverage. Quoting the 1915 case of *Laurenzi*, the Tennessee Supreme Court in *Phoenix* stated that "the primary purpose and object of the contract expressed in the mortgage clause [is] 'to furnish the mortgagee a reliable security in a definite sum free from any interference on the part of the mortgagor which would, to any extent, invalidate or make less adequate that security.'" *Phoenix*, 54 S.W.2d at 972 (quoting *Laurenzi*, 176 S.W. at 1026). The *Phoenix* Court held in favor of the mortgagee, determining that denying coverage based on the occupancy requirement was "inconsistent and repugnant to" the mortgage clause. *Id.*

Similarly, in *Third National Bank v. Thompson*, 191 S.W.2d 190 (Tenn. Ct. App. 1945), the insurance companies providing fire insurance denied coverage for the total loss to a home because the house was being used for a more hazardous purpose than that stipulated in the insurance policy. The court held that the insured's breach of a policy stipulation, without the knowledge of the mortgagee, did not invalidate the mortgagee's coverage. *Thompson*, 191 S.W.2d at 193. The *Thompson* court reasoned that, even if the insured breached the stipulation against an increase of the hazard, the policy was not "void," but was merely voidable by the insurance company as to the insured. It noted that "[t]he policies . . . were voidable only as to the insured, not as to the mortgagee. Such is the effect of the mortgage clause. The [breach] was an act of the insured, not participated in or known by the mortgagee." *Id.* Thus, because the interest of the mortgagee could not be invalidated by the acts or neglect of the insured, the insured's breach of a contractual provision did not affect the mortgagee's rights under the policy. The *Thompson* court reiterated the majority rule, stated in *Laurenzi*, "that the mortgage clause itself controls and prevails over contrary provisions in the policy." *Id.* (citing *Laurenzi*, 176 S.W. at 1025). In view of this caselaw, we must conclude that Scenic's failure to keep and operate the airplane in a manner consistent with the

conditions stated in the policy, without the knowledge of UP Bank, does not affect the bank's rights under the breach of warranty endorsement.

Finally, American Home argues that the trial court erred in rejecting its argument that the loss to the airplane was not a covered peril because the damage to the airplane was not "accidental." The policy language upon which American Home relies is the definition of "Physical Damage":

> "Physical Damage" means direct and *accidental* physical loss of or damage to the aircraft, hereinafter called loss, but does not include loss of use or any residual depreciation in value, if any, after repairs have been made.

(Emphasis added). American Home contends that, because the disappearance of the seats and log books in the airplane was obviously an intentional act, then consequently the damage to the airplane was not "accidental."

UP Bank argues, however, that even if the disappearance of the airplane's seats and log books were the result of an intentional act (which it does not concede),[5] the intentional removal or destruction of the insured property by a third party is considered to be unexpected and unintended, and therefore accidental, as to the loss-payee lender. UP Bank also notes that the policy insured the airplane on an "all risk basis." This "all risk" policy, argues UP Bank, "insures against all risks except those that are expressly limited by the policy provisions." *Lyons Diecasting Co. v. NEC, Inc.*, No. 89-387-II, 1990 Tenn. App. LEXIS 296, at *11-*12 (Tenn. Ct. App. April 27, 1990) (citing *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040 (4th Cir. 1979)); *see also Great Northern Ins. Co. v. Dayco Corp.*, 620 F. Supp. 346, 351 (S.D.N.Y. 1985) (stating that all-risk coverage extends to all unexplained losses).

From a review of the "all risk" provisions in the policy, we find that the policy covers all unexplained losses, such as the loss of the seats and log books of this airplane. "A policy of insurance insuring against 'all risks' is to be considered as creating a special type of insurance extending to risks not usually contemplated, and recovery under the policy will generally be allowed at least for all losses of a fortuitous nature, in the absence of fraud or other intentional misconduct of the insured, unless the policy contains a specific provision expressly excluding the loss from coverage." *See Lyons Diecasting Co.*, 1990 Tenn. App. LEXIS 296, at *12-*13 (quoting 43 Am.Jur.2d *Insurance* § 505); *see also* Jane Massey Draper, B.C.L., Annotation, *Coverage Under All-Risk Insurance*, 30 A.L.R.5th 170 (2001) (surmising generally that a loss arising from an unexplained event is covered under an all-risk policy unless specifically excluded or unless loss is due to wrongdoing of insured). In this case, the record reveals no explanation for the cause of the loss to the seats and logbooks of the airplane, and the policy does not specifically exclude coverage

_____

[5] UP Bank cites to deposition testimony indicating that the circumstances surrounding the loss still remain "unexplained."

for this type of loss. Therefore, to the extent that the trial court rejected American Home's "accident" argument, we affirm the trial court's decision.

Accordingly, we reverse the trial court's determination that UP Bank's rights as loss payee were terminated by Scenic's unilateral cancellation of coverage, or by Scenic's failure to fulfill the conditions of use in the underlying policy. We affirm the trial court's rejection of American Home's argument related to the "physical damage" provision in the policy, to the extent that it made such findings.

The decision of the trial court is reversed in part and affirmed in part, as set forth above, and the cause is remanded for further proceedings consistent with this Opinion. Costs are to taxed to the Appellee, American Home Assurance Company, for which execution may issue if necessary.

_____
HOLLY K. LILLARD, JUDGE